**KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**The Timken Company, Defendant–Intervenor.**

Court No. 91–09–00704.

United States Court of International Trade.

Sept. 21, 1993.

Powell, Goldstein, Frazer, & Murphy, Peter O. Suchman, Susan P. Strommer, Elizabeth C. Hafner, Neil R. Ellis, Niall P. Meagher and D. Christine Wood, Washington, DC, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis; Joan McKenzie and Linda S. Chang, Atty.–Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, of counsel, for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., William A. Fennell, Patrick J. McDonough and Edith A. Eisner, Washington, DC, for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo"), move pursuant to Rule 56.1 of the Rules of this Court for judgment on the agency record contesting the Department of Commerce, International Trade Administration's ("Commerce") final results in *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Administrative Review* ("*Final Results*"), 56 Fed.Reg. 41,508 (1991). Plaintiffs specifically object to Commerce's (1) failure to average U.S. price in the same manner as it averaged foreign market value; (2) model match methodology which resulted in comparisons of commercially dissimilar U.S. and home market products contrary to the requirements of the antidumping law; (3) comparison of U.S. and home market sales across different levels of trade; (4) decision to reclassify plaintiffs' home market post-sale price adjustments, rebates and warranty expenses as indirect selling expenses; (5) failure to deduct direct selling expenses from its calculation of foreign market value; and (6) failure to amortize certain "non-operating and extraordinary expenses" in calculating the value added by further manufacturing.

On April 3, 1991, Commerce published the preliminary results of its administrative review of tapered roller bearings ("TRBs") covering the period from March 27, 1987 through September 30, 1988. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished From Japan; Preliminary Results of Antidumping Duty Administrative Review*, 56 Fed.Reg. 13,618 (1991). On August 21, 1991, Commerce published the final results of its administrative review, which are the subject of this action. *Final Results*, 56 Fed.Reg. 41,508.

## DISCUSSION

■ In reviewing a final determination of Commerce, this Court must uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence has been defined as being "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir. 1990).

### 1. *Averaging of U.S. Prices*

■ In its administrative review, Commerce compared individual U.S. sales prices of TRBs with an annualized, weighted-average foreign market value. Koyo claims that Commerce's failure to average U.S. price in the same manner as it averaged foreign market value was an abuse of discretion and now asks the Court to remand this case to Commerce with instructions to average U.S. price and foreign market value on the same basis.

According to 19 U.S.C. § 1677f–1 (1988 & Supp.1993):

For the purpose of determining United States price or foreign market value under sections 1677a and 1677b of this title, and for purposes of carrying out annual reviews under section 1675 of this title, the administering authority may—

(1) use averaging or generally recognized sampling techniques whenever a significant volume of sales is involved or a significant number of adjustments to prices is required, and

(2) decline to take into account adjustments which are insignificant in relation to the price or value of the merchandise.

**(b) Selection of samples and averages**

The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the transactions under investigation.

Thus, the statute states that Commerce may use averaging techniques "whenever a significant volume of sales is involved or a significant number of adjustments to prices is required." *Id.* Furthermore, the statute grants Commerce exclusive authority to do so as long as the averaging is representative. *Id.*

In the case at hand, Commerce stated:

First, we compared the monthly weighted-average price to the weighted-average price for the entire review period. We found that the period's weighted-average price for more than ninety percent of the products sold came within ten percent of the monthly weighted-average price. Second, we tested whether home market prices of the subject merchandise consistently rose or fell during the period of review. We found that no significant correlation existed between price and time. That is, prices did not consistently rise or fall so as to make period weighted-average prices unrepresentative of home market prices.

Therefore, the results of these tests demonstrate that Koyo's pricing practices remained stable during the review period, thus insuring that a weighted-average FMV for the 18–month period of review is as representative of home market prices as the traditional monthly weighted-average FMV.

*Final Results,* 56 Fed.Reg. at 41,517.

Thus, Commerce's decision to average foreign market value was reasonable and representative. Koyo asserts that Commerce also should have averaged U.S. price. *See Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Judgment on the Agency Record ("Plaintiffs' Memorandum")* at 9. The statute, however, gives no indication that Commerce must average both sides of the equation. In fact, Commerce stated in its Final Results that:

An average USP has been, and continues to be, unacceptable, because it would allow a foreign producer to mask dumping margins by offsetting dumped prices with prices above FMV.... Except in instances where the Department has conducted reviews of seasonal merchandise which has

very significant price fluctuations due to perishability ... the idea of averaging USP has been rejected.... Since the merchandise under review is not a perishable product and significant fluctuations in the price did not occur, there is no reason to believe that averaging of USP is needed.

*Final Results,* 56 Fed.Reg. at 41,517–18.

The same issue was presented in *Koyo Seiko Co. v. United States,* 17 CIT ——, 1993 WL 190929, Slip Op. 93–87 (June 1, 1993), and *Koyo Seiko Co. v. United States,* 17 CIT ——, 1993 WL 366970, Slip Op. 93–176 (Sept. 9, 1993), where this Court upheld Commerce's use of the annualized weighted-average technique only for foreign market value and not for U.S. price. The Court finds no difference between the two cases and thus concludes that Commerce was justified in not averaging U.S. prices. Therefore, the determination of Commerce as to this issue is hereby affirmed.

### 2. *Model Match Methodology*

■ Koyo also claims that Commerce's model match methodology resulted in comparisons of commercially dissimilar U.S. and home market products contrary to the requirements of the antidumping law. Koyo states that in its final results Commerce erroneously revised its model match methodology and that it should have remained with the methodology it used in the original investigation.

In its original investigation of TRBs, Commerce used a "greatest single deviation" measurement for ranking home market similar merchandise. Thus, the U.S. product would be matched with the TRB model whose greatest single deviation among the five physical criteria (inner diameter, outer diameter, width, Y factor and load rating) was smaller that the greatest single deviation of any other foreign market model. Furthermore, the methodology implemented a ten percent cap where no two models would be matched where they differed by more than ten percent in any one of the five criteria. *Final Determination of Sales at Less Than Fair Value; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,*

*From Japan ("Final Determination"),* 52 Fed.Reg. 30,700, 30,703 (1987).

In the final results of this review, Commerce revised its methodology to a "sum of the deviations" measurement for ranking home market similar merchandise without continuing to apply the ten percent cap. In this process Commerce determines the value of each of the five criteria and compares the values of each, thereby selecting the most similar home market TRB model.

Koyo concedes that both methodologies are capable of generating comparisons of such or similar merchandise; however, it further states that there is a limit on the permissible deviation of the criteria used to match TRB models and, therefore, Commerce should use the ten percent cap. *Reply of Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. to Oppositions to Plaintiffs' Motion for Judgment on the Agency Record ("Plaintiffs' Reply")* at 14.

Commerce claims that the ten percent cap is not necessary as it would eliminate from use as comparison models home market sales which overall are most similar to the United States TRBs. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Defendant's Memorandum")* at 21.

This Court affirms Commerce's switch in methodologies; nevertheless, the Court feels that the new methodology must be used in conjunction with the ten percent cap to limit the permissible deviation of the criteria used to make TRB models. Commerce used the cap in its original less than fair value determination and its use avoids comparisons between products which differ so dramatically that they simply cannot be considered commercially similar. *Final Determination,* 52 Fed.Reg. at 30,702–03. Therefore, this case is remanded to Commerce to apply the ten percent cap to the methodology used in the final results.

### 3. *Levels of Trade*

■ Koyo also contests Commerce's comparison of U.S. and home market sales across different levels of trade. Koyo argues that Commerce erred in comparing U.S. and home market TRB models sold at different levels of trade and that the case should be remanded with instructions to Commerce to modify its methodology to ensure that U.S. and home market sales are only compared at the same level of trade. During the review, Commerce first searched for such or similar merchandise at the same level of trade, and then at different levels of trade. *Final Results,* 56 Fed.Reg. at 41,512. Koyo claims that Commerce's comparison of U.S. and home market sales across different levels of trade is not supported by substantial evidence and is contrary to law.

This Court on several occasions has affirmed Commerce's selection of most similar merchandise sold in the home market when alternative levels were unavailable. *See Koyo Seiko Co. v. United States,* 17 CIT ——, 810 F.Supp. 1287 (1993); *Timken Co. v. United States,* 10 CIT 86, 630 F.Supp. 1327 (1986); *NTN Bearing Corp. of America v. United States,* 14 CIT 623, 747 F.Supp. 726 (1990); *Timken Co. v. United States,* 11 CIT 786, 673 F.Supp. 495 (1987); *Koyo Seiko Co. v. United States,* 16 CIT ——, 796 F.Supp. 1526 (1992).

This Court refused to recognize a "level of trade" argument similar to Koyo's in *NTN Bearing Corp.,* 14 CIT at 634, 747 F.Supp. at 736, stating:

> With respect to plaintiffs' contention that the ITA's disregard of levels of trade differences is contrary to law, plaintiffs have not provided, nor has the court uncovered any support for this argument. To the contrary, this court has noted previously that there is no statutory mandate requiring Commerce to remain within the same levels of trade while effecting its "such or similar merchandise" determination. [Citations omitted.] Plaintiffs, therefore, have no basis for requesting that the Court require Commerce to limit its comparisons by the level of trade in which the sales occur.

Thus, Commerce's comparison of sales across different levels of trade was in accordance with law.

Koyo also argues that Commerce's methodology is contrary to Article 2(6) of the Agreement on Implementation of Article VI

of the General Agreement on Tariffs and Trade ("GATT") (1979).

Article 2(6) of the GATT, titled "Determination of Dumping," specifies that:

> In order to effect a fair comparison between the export price and the domestic price in the exporting country (or the country of origin) or, if applicable, the price established pursuant to the provisions of Article VI:1(b) of the General Agreement, the two prices shall be compared at the same level of trade, normally at the exfactory level, and in respect of sales made at as nearly as possible the same time. *Due allowance* shall be made in each case, on its merits, for the differences in conditions and terms of sale, for the differences in taxation, and for the other differences affecting price comparability.

*Id.* (emphasis added).

■ Koyo argues that compliance with the GATT mandates comparison of sales at the same level of trade. The GATT places no such limitation on Commerce's selection of comparison merchandise. The statutory provision itself clearly makes exception and allows for the adjustment of prices when sales are made under different terms and conditions which shall have effect on the price comparability. Therefore, the discretion of the regulating authorities is clearly permitted and codified within this provision. *See Koyo Seiko Co.*, 17 CIT ——, 810 F.Supp. 1287.

■ Koyo argues that Commerce's methodology is contrary to this article. Even if it was, the Court of Appeals for the Federal Circuit recently stated in *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660 (Fed.Cir.1992) that our domestic law, not the GATT, governs. The court stated:

> [E]ven if we were convinced that Commerce's interpretation conflicts with the GATT, ... the GATT is not controlling. While we acknowledge Congress's interest in complying with U.S. responsibilities under the GATT, we are bound not by what we think Congress should or perhaps wanted to do, but by what Congress in fact

did. The GATT does not trump domestic legislation; if the statutory provisions at issue here are inconsistent with the GATT, it is a matter for Congress and not this court to decide and remedy.

*See Id.* at 667; *see also Algoma Steel Corp. v. United States*, 865 F.2d 240, 242 (Fed.Cir. 1989), *cert. denied*, 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 590 (1989); *Koyo Seiko Co.*, 17 CIT at ——, 810 F.Supp. at 1291.

Therefore, as long as the construction is reasonable and fair, Commerce's interpretation is permissible. *See Suramerica*, 966 F.2d at 665; *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 866, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984).

Thus, Commerce's comparison of merchandise across different levels of trade is affirmed as reasonable and in accordance with law.

### 4. *Indirect Selling Expenses*

■ Koyo also contests Commerce's treatment of Koyo's post-sale price adjustments, rebates and warranties as indirect selling expenses rather than directly adjusting home market prices for these adjustments.

Koyo claims that the Department erred in the final results by including its home market rebates, post-sale price adjustments and warranties in the pool of home market indirect selling expenses rather than adjusting home market price directly. Koyo feels that since price adjustments are revisions or corrections to price, not circumstance of sale adjustments (which are generally based on elements of cost—*i.e.*, advertising, technical services and commissions), the adjustments should be directly applied to the home market sales price rather than treated as indirect selling expenses. *Plaintiffs' Memorandum* at 30.

The Court of Appeals for the Federal Circuit has stated on this issue that in order for a discount or rebate to qualify as a direct cost to be subtracted from FMV, the discount or rebate must have been actually paid on all of the sales under consideration and allocated on the basis of actual cost and sales figures. *Smith–Corona Group v. United*

*States,* 713 F.2d 1568, 1580 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). In *Koyo Seiko Co.,* 16 CIT at ——, 796 F.Supp. at 1530, this Court upheld Commerce's treatment of Koyo's post-sale price adjustments as indirect selling expenses because these post-sale price adjustments could not be directly correlated with sales of the subject merchandise using verified cost and sales information. This Court has ruled on this issue in the past and is of the same opinion in the case at hand. *See Koyo Seiko Co.,* 17 CIT at ——, Slip Op. 93–87 at 5; *see also Koyo Seiko Co.,* 17 CIT at ——, Slip Op. 93–176 at 7.

Furthermore, subsequent to the filing of briefs in this case, at an oral argument held on April 22, 1993 in a similar case, counsel for Koyo stated that it had changed its position and conceded this issue. *See Koyo Seiko Co.,* 17 CIT at ——, Slip Op. 93–87 at 5; *see also Koyo Seiko Co.,* 17 CIT at ——, Slip Op. 93–176 at 7. Therefore, Commerce's decision to treat Koyo's post-sale price adjustments, rebates and warranties as indirect selling expenses is affirmed.

### 5. *Deduction of Direct Selling Expenses*

■ Koyo further claims that Commerce's failure to deduct direct selling expenses from its calculation of foreign market value was unsupported by substantial evidence on the record and contrary to law. Koyo states that in calculating foreign market value Commerce should have adjusted constructed value by (a) deducting direct home market selling expenses, and then (b) deducting indirect home market selling expenses up to the amount of the exporter's sales price ("ESP") cap. *Plaintiffs' Memorandum* at 39.

Commerce now concedes that Koyo did in fact sufficiently quantify its claimed direct home market selling expenses so that they should have been treated as a direct adjustment to FMV. Nevertheless, Commerce concludes and Koyo agrees that there should be no remand to Commerce for correction of this error because the effect of the correction would be "extremely minimal, and, as a consequence, the expenditure of administrative resources necessary to perform the remand to correct the error would not be justified."

*Defendant's Memorandum* at 47; *Plaintiffs' Reply* at 30. The Court agrees with the parties on this issue and, therefore, this case will not be remanded for correction of this error.

### 6. *Failure to Amortize Non–Operating and Extraordinary Expenses*

■ Finally, Koyo claims that Commerce erred by failing to amortize certain "non-operating and extraordinary expenses" in calculating the value added by further manufacturing. Specifically, Koyo refers to the expenses for plant expansion, the introduction of new models, and training employees to operate new equipment. *Plaintiffs' Memorandum* at 41. Rather than amortizing such expenses, Commerce included the entire amount in further manufacturing costs for the period covered by this review. *See Administrative Record* (Conf.) Doc. No. 46. Koyo claims that this was unreasonable because it does not reflect the true costs of further manufacturing in the United States and, furthermore, that this was inconsistent with Commerce's established practice. *Plaintiffs' Memorandum* at 41.

Commerce, however, dismisses Koyo's arguments on the grounds that Koyo did not bring this issue to Commerce's attention in a timely manner. In the Final Results, Commerce stated:

> While the Department has amortized start-up costs in prior cases, Koyo did not submit information describing the start-up costs. The Department first learned of these costs during verification. Accordingly, without submitted information describing the nature and amount of these costs, the Department accounted for these costs in the same manner that Koyo accounted for these costs in its financial statements.

*Final Results,* 56 Fed.Reg. at 41,516.

Commerce has promulgated a regulation which sets time limits on the submission of factual information in administrative reviews. The regulation states in pertinent part:

> § 353.31 **Submission of factual information.**
>
> (a) *Time limits in general.* (1) Except as provided in paragraphs (a)(2) and (b) of

this section, submissions of factual information for the Secretary's consideration shall be submitted not later than:

(i) For the Secretary's final determination, seven days before the scheduled date on which the verification is to commence;

(ii) For the Secretary's final results of an administrative review under § 353.22(c) or (f), the earlier of the date of publication of notice of preliminary results of review or 180 days after the date of publication of notice of initiation of the review; ...

. . . .

(2) Any interested party ... may submit factual information to rebut, clarify, or correct factual information submitted by an interested party ... at any time prior to the deadline provided in this section for submission of such factual information or, if later, 10 days after the date such factual information is served on the interested party. . . .

(3) The Secretary will not consider in the final determination or the final results, or retain in the record of the proceeding, any factual information submitted after the applicable time limit. . . .

19 C.F.R. § 353.31(a) (1991).

In this case, the notice of initiation of the review was published on March 8, 1989, and the notice of the preliminary results was published on April 3, 1991. Therefore, submissions of factual information had to be made no later than the earlier of April 3, 1991 or 180 days from March 8, 1989, which is by September 4, 1989. Koyo, however, first sought to raise its amortization claim and submit information relating to it during verification in November of 1990. Therefore, Commerce did not consider this claim. *Final Results*, 56 Fed.Reg. at 41,516.

Koyo, however, claims that it submitted its cost information in a timely manner. It was the explanation of how the costs were calculated that was not provided until verification.

The information submitted by Koyo at verification, however, regarding extraordinary expenses was inconsistent with its financial statements. *See* AR (Pub.) Docs. 135 and 139; *see also, The Timken Company's Response to Plaintiffs' Motion for Judgment on the Agency Record* ("*Timken's Response*") at 14. The total amount of extraordinary expenses in the financial statements was greater than the amount submitted at verification. AR (Pub.) Doc. 135. Therefore, due to this inconsistency Commerce was compelled to account for these costs "in the same manner that Koyo accounted for these costs in its financial statements." *Final Results*, 56 Fed.Reg. at 41,516. Therefore, Commerce was justified in its actions and this issue is hereby affirmed.

## CONCLUSION

In accordance with the foregoing opinion, plaintiffs' motion for judgment on the agency record is granted in part and this case is remanded to Commerce to apply the ten percent cap to the methodology used in the final results. Plaintiffs' motion is denied in all other respects. Remand results are to be filed within forty-five days (45) of the date this opinion is entered. Comments to remand results are to be filed within fifteen (15) days thereafter, and responses to comments are to be filed within ten (10) days of the date comments are filed.